THE STATE OF OHIO, APPELLEE, *v.* KHONG; GERTENSLAGER, APPELLANT.

(No. 49683 — Decided
November 18, 1985.)

*Charles F. Clarke, Richard Gurbst*
and *Stacy D. Ballin,* for appellee.
*Thomas H. Terry III,* for appellant.

PRYATEL, J. In order to reach the issues raised in the instant appeal of the contempt conviction of Assistant County Prosecutor William E. Gerstenslager, it is necessary to examine the proceedings of the criminal trial styled *State* v. *Phuoc Chan Khong,* Cuyahoga C.P. No. CR-186386.

Khong was indicted on a single count of rape which allegedly occurred on September 14, 1983. Appellant Gerstenslager was the assistant county prosecutor assigned to prosecute the case for the state of Ohio.

On November 11, 1983, Richard J. Marco, counsel for the defendant, filed a demand for discovery in accordance with Crim. R. 16. Among other things, he asked for:

"4. The report of any examination or tests administered and upon which the prosecution intends to rely; * * *"

"7. Any exculpatory information that may be available to the prosecution."

On December 1, 1983, at a pretrial before Judge Burt W. Griffin, Marco was told by Gerstenslager that results of hospital tests on the alleged rape victim were not positive for semen, according to testimony from Marco. Gerstenslager indicated to Marco that the reports "are not exculpatory in nature." On December 1, 1983, the following order was issued:

"Pre-trial had. State to provide discovery and supplemental brief by December 8, 1983 * * *."

By the time of the next pretrial on March 26, 1984, Gerstenslager still had not provided the defense with the hospital reports. Marco testified as follows about the discussion on March 26:

"Q. What was the discussion, to the best of your recollection?

"A. There was a discussion concerning certain information that Mr. Gerstenslager had, the identity of which he didn't divulge.

"He said that we needn't know what it was about and it wasn't exculpatory in nature, and he said he had reports.

"Q. I'm sorry?

"A. He said he had reports, but that he was not going to turn those over to me.

"Q. And did he say why he would not?

"A. That I didn't need them for my defense.

"Q. What was your response?

"A. Same thing, you know, that I would like to make my own decision as to what I need for my defense.

"If they are reports that pertain to the case, I want to see them."

As a result of the March 26 pretrial, Judge Griffin issued the following order:

"This matter came on to be heard on the 26th day of March, 1984 upon a consideration of the defendant's rights to complete discovery under Crim. Rule 16.

"It is ordered that the Prosecutor for Cuyahoga County shall disclose, in writing, by April 2, 1984 the existence of, and copies of, all physical evidence or tests which have been requested, received or inquired into by any law enforcement officers or other agents of the state in connection with this case, and shall deliver actual copies of any reports in the possession of the state or any of its agents.

"Pre-trial continued until April 3, 1984."

By April 3, 1984, Gerstenslager still had not complied with the court's discovery orders. On that date, Marco had to leave early and Gerstenslager was delayed due to his presence at a sentencing hearing. On April 3, Judge Griffin entered another order which stated in pertinent part:

"Prosecutor informed by phone to comply with court order dated March [26], 1984 and mail information to defense counsel."

At the contempt hearing, Judge Griffin testified that his orders were specifically directed to reports relating to the victim's examination at a hospital after the alleged rape.

At a June 21, 1984 pretrial, Gerstenslager delivered copies of records from a clinic reflecting that the rape victim had had an abortion and that the stage of development of the fetus could indicate that the alleged victim was pregnant at the time of the charged rape. (Apparently, the defendant contended that the victim concocted the rape charge to explain away her pregnancy.)

Subsequently, the defense filed a motion to dismiss on the grounds that the state had failed to provide material exculpatory evidence to the defendant and that the passage of time had resulted in destruction and unavailability of certain evidence.

At the July 9 hearing on the defendant's motion to dismiss, Gerstenslager told the court he first learned of the abortion around the beginning of April and soon after filed for a protective order because the victim was Catholic[1] and did not want knowledge of the abortion made public. Gerstenslager also said he learned of the pregnancy at the same time he learned of the abortion.

As to when the prosecutor and police obtained the hospital report of the victim's examination after the alleged rape, the following colloquy took place:

"THE COURT: She did not go — when did she first go to the hospital?

"MR. GERSTENSLAGER: I don't know exactly, but I would say it was within a couple of days after the rape that she went to the hospital.

"THE COURT: You don't have the hospital records?

"MR. GERSTENSLAGER: There was nothing significant as far as —

"THE COURT: The hospital records have been turned over to Mr. Marco?

"MR. GERSTENSLAGER: I don't have them. I never subpoenaed them and as far as I know, there were no significant findings.
"* * *

"THE COURT: So the hospital records have not yet been —

"MR. GERSTENSLAGER: I am not even sure she went. I'm not sure.

"THE COURT: You don't even know if she went to the hospital?

"MR. GERSTENSLAGER: No, I don't. I didn't even check.

"THE COURT: Have you checked to see if she went?

"MR. GERSTENSLAGER: I can't say for sure that she did. I seem to remember, but I must have at least — I

---

[1] The contention that the victim was Catholic was not supported by the hospital records. See *infra*.

must have at least a dozen rape cases. I can't remember.

"THE COURT: Would you be able to determine that from looking at your file?

"MR. GERSTENSLAGER: I might be able to. I can't say for sure.

"THE COURT: Let's take a minute and see what you can find in your file.

"MR. GERSTENSLAGER: I believe she was taken to the hospital. There is a notation of a police officer. He said she had Kaiser insurance, and they took her to the hospital.

"THE COURT: So the police took her to the hospital?

"MR. GERSTENSLAGER: If they did it, it was on or about the 19th of September, several days after. Maybe that's why I didn't check, because usually there is nothing — after five days, you can't tell anything.

"* * *

"THE COURT: And you don't know whether they determined that she was pregnant at that time?

"MR. GERSTENSLAGER: Police officer's report says 'no sperm found.'

"THE COURT: What about pregnancy?

"MR. GERSTENSLAGER: It doesn't mention it. There's no reason to check for pregnancy. I didn't know anything about it.

"THE COURT: But am I not correct that in the normal —

"MR. GERSTENSLAGER: Just a moment, Your Honor. I have received a note from the police, something that has been labeled 'Kaiser.'

"THE COURT: Do you have a report from Kaiser Hospital?

"MR. GERSTENSLAGER: It looks like — it's something. It looks like a hospital report.

"THE COURT: Could I see it?

"MR. GERSTENSLAGER: You can see everything.

"THE COURT: I don't want to fish through your file, but I would like to see the hospital report.

"MR. GERSTENSLAGER: Here it is. It looks like a Kaiser Hospital report.

"You see, I have too many files.

"THE COURT: Okay.

"MR. GERSTENSLAGER: The record shows that there were Emergency Room visits on the — I can't read the dates. On the 19th, on 9/17 and 9/19. The record indicates that there were laboratory tests performed.

"* * *

"There is an authorization for release of medical information signed by Margaret Chapek, who, I believe, is the grandmother. It says 'grandmother.'

"* * *

"THE COURT: Has this document been delivered to Mr. Marco?

"MR. GERSTENSLAGER: As far as I know, this is the first time I have seen it. You will notice, it is on short paper and I pulled it out of a package of the police reports that contain all long paper except for that.

"* * *

"MR. GERSTENSLAGER: I think I know when I requested that. I requested it when I found out about the abortion. I know that I told Mr. Marco that there was no sperm found and then I requested that.

"THE COURT: It seems to me that that is a document that you should have turned over. Don't you agree?

"MR. GERSTENSLAGER: I told him there was no sperm found.

"THE COURT: Wasn't he entitled to that document?

"MR. GERSTENSLAGER: I don't know when I got it.

"THE COURT: Under Rule 16 wasn't he entitled to it?

"MR. GERSTENSLAGER: I didn't get it —

"THE COURT: I am not asking you that question. I am just asking you; it seems to me you ought to have turned it over to him, don't you think?

"MR. GERSTENSLAGER: He can have a copy. He can have the document. He can have a copy of it.

"* * *

"THE COURT: I think he is entitled to that document.

"MR. GERSTENSLAGER: But it is basically a negative report.

"* * *

"MR. GERSTENSLAGER: * * * You see, I relied on the police report saying no sperm was found. Usually, if that happens, we don't pursue it any more.

"When I found out she was pregnant, I asked for a copy of the police report, and Detective Tibbitts got these for me sometime around April.

"THE COURT: You think you didn't have that Kaiser report until April?

"MR. GERSTENSLAGER: I don't remember getting it, but Detective Tibbitts got it for me after the abortion because he didn't have it either. All he did was write down 'no sperm found,' but I forgot to give it to Mr. Marco. That's my fault. I forgot to give it to him.

"THE COURT: My question is, what is your normal procedure as to when the police get these hospital reports for you?

"MR. GERSTENSLAGER: * * * Usually we get a police report that says sperm was found or sperm was not found or injury was there or injury was not there.

"If there is no injury or no sperm found, I drop it. All right.

"If there is injury or sperm found, I send for a copy.

"THE COURT: If there is no injury, you don't get the report?

"MR. GERSTENSLAGER: No. I just tell Mr. Marco there was no sperm found.

"THE COURT: Isn't that relevant to the defense, that there was no injury?

"MR. GERSTENSLAGER: I didn't know there was no injury.

"THE COURT: Isn't the lack of injury also a report that is relevant to the defense?

"MR. GERSTENSLAGER: No. She didn't allege that she was beaten to death in this case. So I don't see how it would be relevant.

"* * *

"THE COURT: * * * I am wondering whether in your experience, don't defense counsel normally cross-examine on the fact that the report shows no injury, no trauma, and so on? Isn't that normal cross-examination in a rape case?

"MR. GERSTENSLAGER: Nothing is normal. If it is in a police report, I tell them there is no sperm. I tell them that no sperm was found. I tell them what he wants that is in the police report regarding sperm or injuries.

"In this case there was no injury and no sperm. I told him that.

"THE COURT: Isn't it your experience that it is very common that defense counsel cross-examine on the absence of sperm?

"MR. GERSTENSLAGER: No, it is not common. I can tell you from my experience it is not, but it happens once in awhile. So it does happen.

"All right. But I also tell them if there is no sperm found in there, I tell them.

"THE COURT: Have you handled rape cases before?

"MR. GERSTENSLAGER: Yes. * * *

"* * *

"THE COURT: So how many rape cases have you handled over the period of time you have been in the Prosecutor's Office?

"* * *

"MR. GERSTENSLAGER: Hundreds.

"THE COURT: Hundreds of them?

"MR. GERSTENSLAGER: I tried probably twenty-five.

"So if there is nothing there, I tell them. If they want to get records, I have no objection, but I don't get the records if there is nothing there for me. That is the normal procedure.

"Whether we should go and grab all

the records each and every time, that may —

"THE COURT: They don't have authority to get those records, do they, unless you get a request from the victim?

"MR. GERSTENSLAGER: No, they don't. They send a subpoena, the same way we do, pursuant to a court order, and they provide the information, the same way we get it.

"* * *

"THE COURT: I would just like to make one request. Would you bring to the Court information from the Kaiser Hospital as to when they transmitted that document to the police and that medical information? Would you provide to me from the police when the police provided it to you?

"* * *

"MR. GERSTENSLAGER: I have to call Detective Tibbitts and find out when he got it and from whom, et cetera.

"THE COURT: I am asking if you would do this and bring this Court the information.

"MR. GERSTENSLAGER: What may I ask is the relevance of this, Your Honor? I did tell Mr. Marco that she went to the hospital; but there was no sperm.

"He said, 'Well, that is exculpatory.'

"Well, fine, I told him. He never inquired about what happened, as I remember. I told him and everybody else 'No Sperm,' I told him that.

"THE COURT: So you did have knowledge that she went to the hospital? You have an obligation under the rules. I issued an order on December 4th to turn over the information.

"* * *

"MR. GERSTENSLAGER: I gave him this information long before then.

"THE COURT: You said you didn't give it to him as soon as you got it. All I am asking you for is your record showing when you got it. Would you provide me with the information from the hospital as to when they turned it over to the police, and then from the police, when they turned it over to you? That's all I want."

In a July 9, 1984 letter to Judge Griffin, Gerstenslager advised that the medical records department at Kaiser Hospital "indicates the records were turned over to the police on or about the 14th day of October, 1983." In other words, the police possessed the hospital records approximately thirty days *before* Marco filed his demand for discovery on November 11, 1983.

On August 1, 1984, the court denied the defendant Khong's motion to dismiss and ordered Gerstenslager to show cause why he should not be held in contempt of court for:

"1. Failure to deliver to defense counsel on December 8, 1983, in compliance with the Court's order of December [1], 1983, a copy of the Kaiser Hospital records for the complainant.

"2. Failure to disclose in writing by April 3, 1984 'the existence of all physical evidence or tests which have been requested, received, or inquired into by a law enforcement officer or agent of the State' and 'actual copies of any reports in the possession of the State', including records of Kaiser Hospital, complainant's abortion, and fetal testing, as required by the Court's order of March [26], 1983."[2]

On August 6, 1984, Gerstenslager filed an affidavit of prejudice against Judge Griffin. Chief Justice Frank D. Celebrezze, on September 6, 1984, found that the affidavit did not support a finding of prejudice. Nevertheless, he

---

[2] An amended show cause order issued on August 17, 1984 also included a charge involving statements to a newspaper in violation of the Code of Professional Responsibility. Gerstenslager was acquitted of this latter charge and it is not involved in this appeal.

ordered Judge Griffin not to participate in the Khong matter to avoid even the appearance of any prejudice or impropriety in the trial. The next day, on September 7, 1984, Gerstenslager moved for a transfer of the contempt action. On September 14, 1984, Judge Griffin appointed Charles F. Clarke special counsel for the contempt proceeding. (On September 26, 1984, Khong was found not guilty by a jury of the charge of rape.) On October 5, 1984, Judge Griffin granted a motion to transfer the contempt action.

At the contempt hearing before Judge George McMonagle, defense counsel Marco testified that (1) throughout the pretrials "every discussion that we [he and Gerstenslager] had was that I needed discovery in order to properly prepare a defense"; (2) a detective denied Marco access (without Gerstenslager's consent) to physical evidence that Gerstenslager indicated was available (consent apparently was never given); (3) at the March 26, 1984 pretrial, Gerstenslager refused to turn over reports on the ground that they were not exculpatory and were not needed for Marco's defense; (4) there was exculpatory information in the hospital records, to wit: although the purported rape took place on a Wednesday, the victim did not go to the hospital until Saturday, then left voluntarily, but returned on Monday; the victim reported she was raped by the owner of the restaurant but defendant was a cook there and not the owner; the examiners found no evidence of even the mildest form of bruising; the presence of a high PH factor in the vaginal fluids indicated the presence of recent and frequent intercourse; and the victim was not a Catholic as claimed by Gerstenslager in arguing for a protective order on her abortion; (5) the delay in providing Marco the hospital reports hindered him in preparing a defense and caused him to spend most of the one hundred forty-four hours devoted to the case to efforts to obtain discovery; and (6) discovery problems caused the defendant to "be on the hook for over a year" when he could have been acquitted as early as March.

The only other witnesses to testify at the contempt hearing were a representative of the Cuyahoga County Clerk of Courts (who identified records), two newspaper reporters and Judge Griffin.

Judge George McMonagle denied defendant Gerstenslager's motions for acquittal and dismissal of the contempt charge on the ground that he did not receive a speedy trial under R.C. 2945.71(B)(1).

Judge McMonagle found that the hospital reports contained exculpatory evidence and had been denied to defendant's counsel since November 12, 1983. The court said:

"This Court is convinced beyond a reasonable doubt that the Court order of December 1, 1983, was proper and necessary; that Mr. Gerstenslager knew of and understood the order that he was to provide the Kaiser Hospital information. The Court further finds that he was required to and was able to comply with that Court order but he intentionally elected to disobey it; that such disobedience caused an obstruction to and interference of due administration of justice. The Court finds that Mr. Gerstenslager is guilty of contempt of Court as charged with respect to the order of December 1, 1983."

On December 21, 1984, Judge McMonagle sentenced Gerstenslager to pay a fine of $500 and costs and allowed him thirty days to pay same.

Gerstenslager appeals assigning four errors.

### Assignment of Error No. I

"I. The trial court erred by failing to dismiss the contempt charge for lack of a speedy trial as mandated by Ohio Revised Code, Section 2945.71(B)(1)."

Appellant argues that the contempt charge[3] against him should have been dismissed because he was not brought to trial within the forty-five days required by R.C. 2945.71(B)(1).[4]

We look first to the nature of the proceeding. "Contempts are neither wholly civil nor altogether criminal." *Gompers* v. *Bucks Stove & Range Co.* (1911), 221 U.S. 418, 441. The *sui generis* character of contempt proceedings was further explained by the Supreme Court of Ohio in *Cincinnati* v. *Cincinnati District Council 51*(1973), 35 Ohio St. 2d 197, 201-202 [64 O.O. 2d 129], certiorari denied (1974), 415 U.S. 994:

"Proceedings in contempt are *sui generis* in the law. They bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions; but they are none of these. Contempt proceedings are means through which the courts enforce their lawful orders. *The power to punish for contempt is said to be inherent in the courts and to exist independently from express constitutional provision or legislative enactment.* See *State* v. *Local Union 5760* (1961), 172 Ohio St. 75 [15 O.O. 2d 133], 173 N.E. 2d 331. * * *" (Emphasis added.)

That court also explained at 207-208:

"It is, however, highly doubtful that the General Assembly may properly limit the power of a court to punish for contempt. Although it is conceded that the General Assembly may prescribe procedure in indirect contempt cases, *the power to punish for contempt has traditionally been regarded as inherent in the courts and not subject to legislative control.* See *State* v. *Local Union 5760, supra* (172 Ohio St. 75 [15 O.O. 2d 133]). The Courts of Common Pleas are established by Section 1 of Article IV of the Ohio Constitution not by the General Assembly, and, hence, are co-equal branches of the government. Those courts are vested with the judicial power of the state, which includes the power to enforce lawful orders by contempt proceedings." (Emphasis added.)

The *Gompers* court agreed at 450:

"* * * [T]here could be no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience. For while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory.

"* * *

"* * * Without authority to act promptly and independently the courts could not administer public justice or en-

---

[3] R.C. 2705.02 provides in pertinent part:

"A person guilty of any of the following acts may be punished as for a contempt:

"(A)  Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or an officer;

"(B)  Misbehavior of an officer of the court in the performance of his official duties, or in his official transactions;

"* * *"

[4] R.C. 2945.71(B)(1) states:

"(B)  A person against whom a charge of misdemeanor, other than a minor misdemeanor, is pending in a court of record, shall be brought to trial:

"(1)  *Within forty-five days* after his arrest or the service of summons, if the offense charged is a misdemeanor of the third or fourth degree, or other misdemeanor for which the maximum penalty is imprisonment for not more that sixty days;

"* * *" (Emphasis added.)

force the rights of private litigants. *Bessett* v. *Conkey,* 194 U.S. 337."

The power to punish for contempt is part of the inherent judicial power of the courts — a power to perform what is generally recognized as necessary to the judicial function. Hence, we conclude that in the exercise of the court's necessary function, contempt proceedings are not subject to the legislative strictures of R.C. 2945.71.

As the court held in *Zakany* v. *Zakany* (1984), 9 Ohio St. 3d 192, syllabus: "A court has authority both under R.C. 2705.02(A) and on the basis of its inherent powers to punish the disobedience of its orders with contempt proceedings." Indeed, the Ohio Criminal Code itself recognizes the inherent power of the court in contempt proceedings by virtue of R.C. 2901.03 which states:

"(A) No conduct constitutes a criminal offense against the state unless it is defined as an offense in the Revised Code.

"(B) An offense is defined when one or more sections of the Revised Code state a positive prohibition or enjoin a specific duty, and provide a penalty for violation of such prohibition or failure to meet such duty.

"(C) This section does not affect any power of the general assembly under section 8 of Article II, Ohio Constitution, *nor does it affect the power of a court to punish for contempt* or to employ any sanction authorized by law to enforce an order, civil judgment, or decree." (Emphasis added.)

This statute reinforces our view that contempt proceedings are not subject to the speedy trial statute.

But even were we to apply R.C. 2945.71, we would find that Gerstenslager was not denied a right to a speedy trial. Gerstenslager was charged on August 1, 1984 and brought to trial on December 11, 1984. Most of the intervening time was tolled as the result of Gerstenslager's own affidavit of prejudice and his motion to transfer. R.C. 2945.72(H) provides that "[t]he period of any continuance granted on the accused's own motion" may extend the time within which an accused must be brought to trial.

We would assign five days from August 1, 1984 (date of the show cause order) to August 6, 1984 when appellant Gerstenslager filed his affidavit of prejudice to apply on the forty-five days allowed until trial. That affidavit was directed to the contempt action as well as to the rape action as evidenced by Gerstenslager's own attached affidavit which reads:

"4. That Burt W. Griffin has evidenced bias and prejudice *against the State of Ohio* and the minor victim and ought to be disqualified from hearing further motions and/or entering further orders and/or trying the above-captioned matter;

"5. That the bias and prejudice of Burt W. Griffin is *established in an Order entered by him on August 1, 1984 wherein the he [sic] accused affiant* of bad faith which accussation [sic] is unsupported by the record or by any fact;" (Emphasis added.)

Gerstenslager's December 10, 1984 motion to dismiss states that Judge Griffin "was divested of jurisdiction [in the contempt matter] upon the filing of an Affidavit of Prejudice by the State of Ohio on 6 August 1984."

Although the Supreme Court on September 6, 1984 removed only "the cause" from Judge Griffin's jurisdiction, clearly Gerstenslager meant the affidavit of prejudice to include the contempt matter. Thus, we hold the time was tolled by appellant's motion between August 6, 1984 and September 6, 1984.

A day later, Gerstenslager filed his motion to transfer the contempt proceeding and on September 19, 1984 he filed an application for an alternative

writ of prohibition in this court,[5] again tolling the time until the motion to transfer was granted on October 5, 1984. As to this period, we, therefore, count no time.

The motion to transfer was granted by Judge Griffin on October 5 and referred to the presiding judge of the common pleas court. On November 23, 1984, the presiding judge reassigned the case to Judge George McMonagle who tried it on December 11, 1984. R.C. 2945.72(H) provides that the time within which a defendant must be brought to trial may be extended by "the period of any reasonable continuance granted other than upon the accused's own motion" as well as "on the accused's own motion."

The court said in State v. Wilson (1982), 7 Ohio App. 3d 219, 222:

"Having found no cases which provide us with any guidelines as to the reasonableness of the time utilized by the trial court to respond to * * * [a motion for discharge], we find this to be a 'judgment call' on our part. With this in mind, after taking into consideration the day to day demands upon the trial judges and after taking into consideration the fact that the schedule of a trial judge is to a great extent set well in advance of any given date, we find that the twenty-one day time period was reasonable."

Here, the delay in bringing Gerstenslager to trial was occasioned by the defendant's own motions and the time required for the court to respond to those motions. We cannot say that the period of time it took to reassign the case from Judge Griffin to the presiding judge and then to Judge McMonagle was unreasonable. Appellant can hardly be heard to complain since any delays were occasioned by his unwillingness to have Judge Griffin conduct the contempt proceedings. In determining whether the time required by the court to respond to Gerstenslager's motions was unreasonable, we must take into consideration the day-to-day demands on the court and its individual judges and their own prior commitments to their dockets. We conclude that no more than twenty-three days[6] may be counted for speedy trial purposes under the statute which would allow forty-five days to elapse between the issuance of the show cause order and the trial. The remainder of the time is accounted for by Gerstenslager's own motions and the period required to implement the transfer he sought and Judge Griffin granted.

We recognize that it is well-established that defendants in contempt proceedings must be afforded many of the rights and protections guaranteed them by the Constitutions of the United States and the state of Ohio. For instance, in Brown v. Executive 200, Inc. (1980), 64 Ohio St. 2d 250 [18 O.O. 3d 446], the standard of proof of guilt beyond a reasonable doubt was extended to contemnors. The Brown court cited its conclusion in State v. Kilbane (1980), 61 Ohio St. 2d 201, 205 [15 O.O. 3d 221], to the effect that " '[t]he most important consequences arising from this classification of contempts is that many of the significant constitutional safeguards required in criminal trials are also required in criminal contempt proceedings.' "

Therefore, we hold that defendants in contempt proceedings of a criminal nature must be afforded the constitutional right to a speedy trial. In State v. Turner (1982), 4 Ohio App. 3d 305, the

---

[5] On October 23, 1984, we dismissed the petition for writ of prohibition upon Gerstenslager's stipulation. (Cuyahoga App. No. 49235, unreported.)

[6] August 1 (show cause order) to August 6 (affidavit of prejudice) accounts for five days; November 23 (case assigned to Judge McMonagle) to December 11 (trial) accounts for eighteen days.

court held, as we do here, that even though the statutory right to speedy trial did not apply in a particular instance, the constitutional requirements were applicable. The *Turner* court said at 306-307:

"In reviewing defendant's claim that he was denied his constitutional right to a speedy trial, we shall first look at the issue as explained by the United State Supreme Court in *Barker* v. *Wingo* (1972), 407 U.S. 514. The court adopted a balancing test in determining whether the defendant received a speedy trial. It enumerated four criteria which should be considered: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

"In the instant case, eleven and one half months elapsed between the time the defendant's first convictions were reversed and remanded and the time his second trial was to commence. Although this exceeds the more restrictive time frame provided for in R.C. 2945.71, it is not necessarily such a long delay as to violate the speedy trial provisions of the United States or Ohio Constitutions. *Barker* v. *Wingo, supra* (five-year delay); *State* v. *Rice* (1968), 14 Ohio App. 2d 20 [43 O.O. 2d 56] (fourteen-month delay); and *Shafer* v. *State* (1932), 43 Ohio App. 493 (eighteen-month delay). Thus * * * we must look at the other criteria to ascertain whether * * * [defendant's] constitutional right was violated."

See, also, *State* v. *McAllister* (1977), 53 Ohio App. 2d 176, 179 [7 O.O. 3d 247].

We already have discussed the length and reasons for the delay. Appellant Gerstenslager neither briefed nor demonstrated that he was prejudiced by the fact the trial did not begin until December 11, 1984. Nor did he ever assert his right to a speedy trial until the start of his trial.

Therefore, applying the balancing test of *Barker* v. *Wingo,* as adopted by the *Turner* court, we hold that any delay that occurred in bringing appellant to trial was reasonable and that he was accorded his constitutional right to a speedy trial.

The first assignment of error is overruled.

### Assignment of Error No. II

"II. The trial court erred by failing to grant the motions of defendant for a directed verdict of acquittal."

Appellant contends that he should have been acquitted by a directed verdict because (1) intent was not established, (2) venue was not proven, and (3) he was not identified.

We have held that intent to disobey the court's order is a condition precedent to a finding of contempt. *Vegh* v. *Kish* (1964), 8 Ohio App. 2d 217 [29 O.O.2d 376], paragraph one of the syllabus. In a case of direct contempt, the Supreme Court of Ohio held that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts. *State, ex. rel. Seventh Urban, Inc.,* v. *McFaul* (1983), 5 Ohio St. 3d 120, 123.

The natural, reasonable and probable consequences of Gerstenslager's disobedience of the court's order was the obstruction to and interference of due administration of justice.

In *Ahmed* v. *Reiss Steamship Co.* (N.D. Ohio 1984), 580 F. Supp. 737, 745, affirmed on other grounds *sub nom. In re Jacques* (C.A.6, 1985), 761 F. 2d 302, the court explained:

" 'Proof of an evil motive or of an actual intent to obstruct justice is unnecessary.' * * * [Defendant's] protestation of a lack of intent to deceive the court or to obstruct justice is irrelevant. * * * The only intent that need be shown is that the contumacious attorney knew or should have known that his conduct exceeded the outermost limits of his proper role and hindered rather than facilitated the search for the truth. * * *

'An attorney's intent may be inferred if his conduct discloses a reckless disregard for his professional duty. * * * ' "(Citations omitted.)

The evidence here clearly establishes defendant deliberately failed to comply with the specific order of the court, thus interfering with the administration of justice.

The venue requirement appears in R.C. Title 29 which relates to general crime procedures. Specifically R.C. 2901.12 provides in pertinent part:

"(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element thereof was committed."

There is no question that a court has jurisdiction over the subject matter of contempts of its own orders. We said in *State* v. *Balyer* (Feb. 9, 1984), Cuyahoga App. No. 47001, unreported, at 4:

"It has been held that express evidence to establish venue is not necessary if, from all of the facts and circumstances in the case, it is established beyond a reasonable doubt, that the crime was committed in the county and state named in the indictment. *State* v. *Dickerson* (1907), 77 Ohio St. 34; *State* v. *Collins* (1977), 60 Ohio App. 2d 116 [14 O.O. 3d 94]; *State* v. *Neff* (1957), 104 Ohio App. 289 [4 O.O. 2d 423]."

The record here clearly establishes that the contempt occurred in the Court of Common Pleas of Cuyahoga County and the hearing was conducted in that same court. Appellant would have us apply general criminal statutory strictures to contempt proceedings which we decline to do under this argument as we did under the first assignment of error. We hold that the court has jurisdiction under its inherent power to punish for disobedience of its own orders.

As for the claim that Gerstenslager was not identified, we note the following testimony of Attorney Marco:

"Q. I am sure you recognize whether Mr. Gerstenslager is present in the courtroom?

"A. Yes, he is here at the counsel table with Mr. Terry."

The rule as to acquittals is succinctly stated in *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261 [9 O.O. 3d 401], syllabus, as follows:

"Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."

We hold that the second assignment of error is without merit.

Assignment of Error No. III

"III. The trial court erred in failing to grant the motion to dismiss made at the close of Judge Griffin's testimony."

Under this assignment, appellant ignores the fact that his motion to dismiss made at trial was based on the speedy trial issue but here for the first time argues that the charge should have been dismissed because its substance lacked specificity.

We disagree. Appellant was charged with failure to comply with the court's orders. The record demonstrated that failure, and supports his conviction of contempt as charged.

Additionally, we need not consider errors not raised below (*Kalish* v. *Trans World Airlines* [1977], 50 Ohio St. 2d 73 [4 O.O. 3d 195]). We overrule the third assignment of error.

Assignment of Error No. IV

"IV. The conviction is not supported by the weight of the evidence."

The appellant claims the record is insufficient to support the findings of the trial court and his conviction.

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as

being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 280 [8 O.O. 3d 261].

As is apparent from the review of the evidence, there was, indeed, competent credible evidence reaching all of the essential elements.

The fourth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

MARKUS, P.J., and ANN McMANAMON, J., concur.